**Gregory J. PETTINATO**

v.

**Susanne L. PETTINATO.**

**No. 89–56–A.**

Supreme Court of Rhode Island.

Nov. 30, 1990.

Joseph Sciacca, Palombo & Piccirilli, Providence, for plaintiff.

Karen Pelczarski, William Landry, Blish & Cavanagh, Providence, for defendant.

OPINION

SHEA, Justice.

This matter comes before the Supreme Court on Susanne L. Pettinato's appeal from a Family Court order awarding custody of a minor child to her now former husband. We affirm.

On May 4, 1987, Gregory J. Pettinato (hereinafter Gregory) filed a complaint for divorce against Susanne. On the same date, Gregory also filed a motion for temporary custody of Gregory J. Pettinato, Jr. (hereinafter Gregory, Jr.).

On May 4, 1987, the Family Court issued an ex parte custody order awarding temporary custody of Gregory, Jr., to Gregory. After a hearing on a motion for temporary custody before the trial justice, an order granting joint custody with possession in Gregory was issued on June 16, 1987, and continued on July 7, 1987. An amended complaint for divorce was filed on September 13, 1988, by Gregory, naming both Gregory, Jr., and Nicholas, born December

28, 1987, as minors. Gregory sought custody of both children.[1]

Although many of the facts were disputed, it appears that a relationship developed between Gregory and Susanne in the fall of 1984. The parties disagreed about the date when they began sexual relations. However, it is undisputed that the parties were engaging in sexual relations by February 1985. Susanne testified that she did not engage in sexual relations with Gregory between February 14, 1985, and April 7, 1985. During that period she traveled to Florida for two weeks. Moreover, Susanne testified, she did not speak with Gregory until after November 1985 when she returned to Rhode Island from her second trip to Florida.

Susanne gave birth to Gregory, Jr., on January 5, 1986. Despite the parties' discrepancies regarding events leading to the child's birth, Gregory was named as the child's father on the birth certificate filed on January 13, 1986.

Susanne testified that she told Gregory while in the hospital after giving birth that Gregory, Jr., was the child of the man she had stayed with while in Florida. Gregory disputed this testimony. He testified that Susanne telephoned him in April 1985, informed him of her pregnancy, and stated that he, Gregory, was the father. Gregory first became aware of Susanne's denial of his paternity at the time of this divorce action when she filed her answers to interrogatories.

The evidence established that the parties had a fairly nomadic existence after the birth of Gregory, Jr. For approximately one month after the child's birth, Susanne and the child lived at her parents' home. Gregory was forbidden by her parents to visit Susanne or Gregory, Jr., although the parties would arrange to meet at a friend's house without the knowledge of Susanne's parents. Thereafter, Susanne and the child shared a rented apartment with a friend for approximately three months before moving into an apartment with Gregory.

Gregory, Susanne, and Gregory, Jr., lived in an apartment from May 1986 until October 1986. All three then moved into Gregory's parents' home in October 1986. Gregory and Susanne married on December 21, 1986. Gregory testified that he married Susanne because he "thought it would be the proper thing to do to make a family and be on our own together and bring up our child." The parties remained at his parents' home until Susanne moved out on April 26, 1987. Susanne initially left Gregory, Jr., with Gregory and his parents. Susanne testified, however, that the Cranston police retrieved Gregory, Jr., the next day and brought the child to her at a friend's home. After leaving Gregory, Susanne gave birth to Nicholas.

The Family Court heard testimony from Gregory's parents regarding the care given to Gregory, Jr., by Susanne. Gregory's father, Frank Pettinato, testified that "she would do something else rather than take care of the baby." Moreover, Gregory's mother, Barbara Pettinato, testified to similar situations when Susanne suggested it was someone else's turn to care for Gregory, Jr.

Over the objections of Gregory, the court heard testimony from Marjorie Kimball, a medical technologist at the Rhode Island Blood Center. Kimball testified that she performed genetic blood testing on Gregory, Susanne, and Gregory, Jr. As a result of this genetic blood testing, Kimball concluded that it was not possible for Gregory to be the biological father of Gregory, Jr.

The trial justice issued an interlocutory decision pending entry of final judgment on October 11, 1988. He granted the petition of Gregory for an absolute divorce and awarded Gregory permanent custody of Gregory, Jr., subject to all reasonable rights of visitation for Susanne. In his decision the trial justice based the award on the care given Gregory, Jr., by Gregory, the length of time Gregory, Jr., spent with Gregory, and the bonding that had occurred between Gregory, Jr., and Gregory.

1. This appeal involves only the Family Court's custody award of Gregory, Jr., to Gregory. The custody award of Nicholas to Susanne is not before us.

On appeal Susanne argues that the trial justice improperly overlooked and/or misconceived the expert testimony regarding the genetic blood testing that excluded Gregory as the biological father of Gregory, Jr. Susanne contends that as the natural parent of Gregory, Jr., she is entitled to custody of the child absent a showing of unfitness. She also argues that the award of custody to Gregory was not in accordance with the best interests of the child.

In this case we consider for the first time the rights of parents whose legal presumption of paternity is later challenged during a divorce proceeding. It is undisputed that Gregory is the presumptive natural father of Gregory, Jr. General Laws 1956 (1988 Reenactment) § 15–8–3 provides in relevant part.

> "Presumption of paternity.—(a) A man is presumed to be the natural father of a child if:
>
> *     *     *     *     *     *
>
> (3) After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage could be declared invalid, and:
>
> (i) He has acknowledged his paternity of the child in writing filed with the clerk of the [F]amily [C]ourt; or
>
> (ii) With his consent, he is named as the child's father on the child's birth certificate; or,
>
> (iii) He is obligated to support the child under a written voluntary promise or by court order;
>
> (4) He acknowledges his paternity of the child in a writing filed with the clerk of the [F]amily [C]ourt, who shall promptly inform the mother of the filing of the acknowledgement, and she does not dispute the acknowledgement, within a reasonable time after being informed thereof, in a writing filed with the clerk of the [F]amily [C]ourt. If another man is presumed under this section to be the child's father, acknowledgement may be

effected only with the written consent of the presumed father or after the presumption has been rebutted.

> (b) A presumption under this section may be rebutted in an appropriate action only by clear and convincing evidence. If two (2) or more presumptions arise which conflict with each other, the presumption which on its facts is founded on the weightier considerations of policy and logic controls. The presumption is rebutted by a court decree establishing paternity of the child by another man."

Susanne admits that Gregory has met the requirements of § 15–8–3(a)(3)(ii).[2] The parties married after Gregory, Jr.'s birth, and with his consent Gregory was named as the child's father on the birth certificate. Nevertheless, Susanne contends, the results of the genetic blood testing that excluded Gregory as the biological father provide the "clear and convincing" evidence required by § 15–8–3(b) to rebut the presumption of Gregory's paternity.

We are concerned about the situation before the court wherein a mother can tell a man that he is the father of her child, marry him and live together as a family, and then illegitimize the child during a divorce proceeding by attacking the legal presumption of paternity that she helped to bring about. The situation before us is a matter of first impression in this state. After reviewing the conclusions arrived at by other states that have considered this issue, we have reached the conclusion that Susanne may not defeat Gregory's legal presumption of paternity.

We are of the opinion that a mother should be equitably estopped from using the genetic blood testing permitted by § 15–8–11 to disestablish a child's paternity in connection with a routine divorce proceeding. The underlying rationale of the equitable-estoppel doctrine is that "under certain circumstances, a person might be estopped from challenging paternity where that person has by his or her conduct ac-

---

**2.** In her brief Susanne admits that Gregory is the presumptive natural father but argues that she has overcome this presumption.

cepted a given person as father of the child." *John M. v. Paula T.*, 524 Pa. 306, 318, 571 A.2d 1380, 1386 (1990). Where the equitable-estoppel doctrine is operative, evidence of genetic blood tests is considered irrelevant in a divorce proceeding wherein the basic issue is the termination of the marriage bond—not the paternity of a child. "[T]he law will not permit a person in these situations to challenge the status which he or she has previously accepted [or created]." *Id.*

The circumstances of the case before us, in our opinion, compel the application of the equitable-estoppel doctrine. Gregory has represented himself to be and has been accepted as Gregory, Jr.'s natural father. He married Susanne, believing her representation that the child was his child. He married her with the intention that the couple would raise their child in a family unit. Gregory consented to being named as the father on Gregory, Jr.'s birth certificate. The three lived together and represented themselves to the community as a family. Susanne never questioned Gregory's paternity until after he commenced divorce proceedings that followed her leaving him. At the time he filed for divorce, Susanne had become pregnant again but not by Gregory.

Taken together, this court's adherence to the statutory presumption of paternity in § 15–8–3(a)(3)(ii) and the court's application of the equitable-estoppel doctrine lead to the same point: the genetic blood test results offered into evidence were not relevant because legal paternity had been established and biological paternity was not at issue. *Scott v. Mershon,* 394 Pa.Super. 411, 417–418, 576 A.2d 67, 71 (1990). Therefore, the genetic blood test results disestablishing Gregory's paternity should not have been admitted. We reject Susanne's contention that the trial justice overlooked and/or misconceived the expert testimony regarding genetic blood testing. That testimony should have been excluded as irrelevant on Gregory's objection to its admission.

■ Alternatively Susanne argues that even absent the natural-parent presumption, the trial justice improperly awarded custody to Gregory. This court has held that child-custody awards must be made in the "best interest[s]" of the child. *Petition of Loudin,* 101 R.I. 35, 39, 219 A.2d 915, 918 (1966). Susanne argues that the trial justice's custody award was not in accordance with the best interests of Gregory, Jr.

■ Our Legislature has not statutorily defined the factors that compose "the best interests of the child" standard.[3] Consequently in this state, the best interests of the child standard remains amorphous and its implementation has been left to the sound discretion of the trial justices. However, there are identifiable factors that must be weighed in the best interests of the child analysis when relevant. These factors include:

1. The wishes of the child's parent or parents regarding the child's custody.

2. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.[4]

3. The interaction and interrelationship of the child with the child's parent or parents, the child's siblings, and any other person who may significantly affect the child's best interest.

4. The child's adjustment to the child's home, school, and community.

5. The mental and physical health of all individuals involved.[5]

6. The stability of the child's home environment.[6]

7. The moral fitness of the child's parents.[7]

---

3. Several states, including Florida, Maine, and North Dakota, have statutorily defined factors.

4. Fla.Stat.Ann. § 61.13(3)(i)(West 1985).

5. Factors (1)(3)(4)(5) are taken from the Uniform Marriage and Divorce Act § 402, 9A U.L.A. 561 (West 1987).

6. Me.Rev.Stat.Ann. tit. 19, § 752(5)(E) (Supp. 1985–86).

7. Fla.Stat.Ann. § 61.13(3)(f).

8. The willingness and ability of each parent to facilitate a close and continuous parent-child relationship between the child and the other parent.[8]

■ The best interests of the child should not be determined by assessing any one factor. The trial justice must consider a combination of and an interaction among all the relevant factors that affect the child's best interests.

■ Our review on this issue is limited to whether the trial justice abused his discretion by granting permanent custody to Gregory. *Veach v. Veach*, 463 A.2d 508, 510 (R.I.1983).

In the case before us there is evidence that Gregory is the parent who will better provide for the best interests of Gregory, Jr. The Department for Children and Their Families domestic relations study concluded that Gregory was the more stable parent who has demonstrated his ability to care for Gregory, Jr. Additionally, evidence

was admitted concerning Susanne's erratic living arrangements both prior to and after her separation from Gregory. Moreover, testimony was given concerning Susanne's restlessness when confronted with the duties associated with caring for Gregory, Jr. After a careful review of the record, we conclude that the trial justice did not abuse his discretion. He had the opportunity to evaluate the evidence regarding the parent who will better provide for the best interests of Gregory, Jr.

For these reasons the defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers of the case are remanded to the Family Court.

8. Fla.Stat.Ann. § 61.13(3)(a).